### Richmond

## John Pope v. Commonwealth.

### November 17, 1921.

1. DISORDERLY HOUSE—*Evidence—Occasional Acts—Knowledge of Proprietor—Case at Bar.*—In a prosecution for keeping a disorderly house, the evidence showed that the dancing which took place on a particular evening was indecent, degrading, and prejudicial to the public morals. The evidence as to the purveying of ardent spirits on the premises was both direct and circumstantial, and convicted the accused of guilty knowledge of and participation in the same. From the evidence the accused or his floor manager must have known of the indecent, vulgar and immoral things described as taking place that evening by the witnesses. The incidents of that particular evening, as related by the witnesses for the State, were substantially unchallenged and were continuous during the hours between midnight and two o'clock. There was evidence of indecent dancing at the place on another occasion.

   *Held:* That the evidence showed knowledge of the accused of the disorder, and warranted the conclusion that the disorderly practices were habitual and not confined to a single occasion.

2. DISORDERLY HOUSE—*Common Nuisance—Single Act.*—A single act of vulgarity or indecency by paid performers, interpolated contrary to the instructions or wishes of the owner of a house, or the unexpected indecencies of patrons on a single occasion, or in the course of a single evening, would not constitute an establishment a common nuisance.

3. NUISANCES—*Things Injurious to Public Morals.*—As a general proposition, the fact that certain things are injurious to public morals is sufficient to render them public nuisances.

4. NUISANCES—*Disorderly House.*—At common law a disorderly house is a public nuisance.

5. DISORDERLY HOUSE—*Definition.*—A disorderly house is a house in which people abide, or to which they resort, to the disturbance of the neighborhood, or for purposes injurious to public morals, health, convenience, or safety.

6. DISORDERLY HOUSE—*Knowledge of Proprietor—Direct or Circumstantial Evidence.*—In a prosecution for keeping a disorderly

house, the State must prove the defendant's knowledge of improper practices in his establishment, but such knowledge may be established like any other fact by direct or circumstantial evidence.

7. DISORDERLY HOUSE—*Diligence of Proprietor.*—A proprietor should be diligent to see that his entertainments are not destructive of morality, or infected with indecency. He is not permitted to shut his eyes to occurrences that it is his duty to prevent, and find safety in a claim of ignorance.

8. DISORDERLY HOUSE—*Single Act of Disorder—Recurrence During Period of Time.*—It is true that there must be something more than a single act of improper conduct to support conviction of keeping a disorderly house. There must be recurrence; but there is no particular extent of time prescribed during which the improper practices must continue, or recur, or any fixed amount of recurrence of dissolute practices to constitute an establishment a disorderly house.

9. DISORDERLY HOUSE—*Single Act of Disorder—Recurrence During Period of Time—Single Day.*—A building may be so used on a single day as to justify the inference, with but slight additional evidence, that the illicit use has been continuous. But the inference in such a case is one of fact, and not of law, and must be drawn, if at all, by the trial judge in the light of all the circumstances.

10. DISORDERLY HOUSE—*Single Act or Disorder—Recurrence During Period of Time—Single Day—Case at Bar.*—In the instant case, there were present at accused's cabaret on the night in question whites and blacks, male and female, some of them certainly vicious and dissolute. Drinking was prevalent, and one woman at least was drunk. The evidence indicated that the happenings of that evening were not casual, fortuitous, or unexpected. The dancing described as indecent was of the same character as that occurring on a previous evening. Hence, additional evidence, even if slight, was not lacking, and the jury were justified in drawing the inference of fact that the occurrences of the night were measurably a recurrence of like antecedent illegalities.

11. DISORDERLY HOUSE—*Instructions—Knowledge of Proprietor.*—In a prosecution for keeping a disorderly house, the jury were instructed that proof of actual knowledge by the defendant of the acts and doings of the women he employed was not necessary, since the law requires him to use reasonable diligence to ascertain the character of such acts and doings, and that proof of facts which would put a reasonable man on notice is sufficient.

*Held:* No error.

12.  DISORDERLY HOUSE—*Instructions—Recurrence of Acts.*—In a prosecution for keeping a disorderly house, the jury were instructed that the acts complained of must be of common and habitual occurrence, but that the law fixes no definite continuance of time during which such acts must occur to meet the requirements of common and habitual ocurrence. "It is sufficient to meet this requirement if they occur with such frequency, and during such substantial period of time covered by the indictment, as to constitute a continuing menace to public morals."

    *Held:* No error.

13.  DISORDERLY HOUSE—*Instructions—Repetition.*—The elision by the court from an instruction of a paragraph relating to matter upon which the jury has been adequately instructed was not error.

14.  DISORDERLY HOUSE—*Instructions—Evidence for the Defense—Recurrence of Acts.*—In a prosecution for keeping a disorderly house, the court rejected an instruction for defendant, which advised the jury that if they believed from the evidence that the police and various respectable citizens had visited accused's establishment prior to the evening to which the Commonwealth's evidence principally related, and had not seen any improper conduct, then if the jury believed that there was improper conduct on the night in question, this was insufficient for conviction; that in order to justify conviction, the improper conduct must be customary, common, or habitual. The jury had already been instructed with respect to the necessity for common and habitual occurrence to support conviction, and advised as to the meaning of the words "common and habitual occurrence."

    *Held:* That there was no occasion to give this instruction, as it was for the jury to determine the value to be attached to the evidence of the police and others.

Error to a judgment of the Corporation Court of the city of Norfolk.

*Affirmed.*

The opinion states the case.

*Tomlin & Maupin,* for the plaintiff in error.

*John R. Saunders, Attorney-General, J. D. Hank, Jr., Assistant Attorney-General,* and *Leon M. Bazile, Second Assistant Attorney-General,* for the Commonwealth.

SAUNDERS, J., delivered the opinion of the court.

John Pope was indicted in the Corporation Court of the city of Norfolk for keeping and maintaining a disorderly house in that city, on November 23, 1920, and on divers other days within twelve months preceding that date,— that is to say, he was indicted for maintaining a common law nuisance. It is not necessary to reproduce the indictment in full. Upon the trial under this indictment, the defendant was convicted, and his punishment fixed by the jury at six months in jail, and a fine of five hundred dollars. The accused applied for and secured a writ of error to the judgment of the court. His petition assigns various errors.

[1, 2] First: The court erred in giving instructions four and nine, at the instance of the Commonwealth.

Second: The court erred in amending instructions five, six and seven, prayed by the accused, and giving them as amended, and refusing to grant instruction ten, offered by the accused.

Third: In overruling the motion of the accused to set aside the verdict as contrary to the law and the evidence, and grant a new trial.

Under this head, the petition says: "These assignments of error can be argued together, since the real point in issue has a two-fold aspect.

I. Whether under the evidence the accused has been shown to have had any knowledge of any unlawful, or disorderly acts.

II. Whether evidence regarding a single occasion of disorderly acts, in the conduct of a lawful business, is sufficient under the law to justify a conviction of the offense of maintaining a common nuisance.

In support of his contentions of law, petitioner cites many precedents, and authorities from other States, alleging that he can find nothing in point in the law writers, and precedents of this State.

John Pope, the defendant, is a colored man, and the proprietor of the Chesterfield hotel, in the city of Norfolk, a hotel run by and for colored people. ·Pope has been engaged in this business since 1918. In connection with the hotel business the defendant conducted a cabaret, in which food and drink were sold to his customers. Dancing by paid performers as well as patrons constituted a feature of the entertainment which was provided. The dances were "shimmey," or "honk-a-tonk" dances, and were indulged in by both white and black persons. It does not appear that the two races were on the floor at the same time, the floor being cleared of colored performers when the white people danced. Nor did the whites and blacks eat together, further than being in the same room, the tables for the white people being on one side of the room, and for the colored people on the other. The locality is a colored one.

In September, 1920, in addition to his hotel license, Pope applied for and secured a dance hall license for his cabaret. On the night of November 23, 1920, J. H. Hollomon, Keville Glennan, Robert B. Murray, Wm. Jenkins and Herman Thomas, the last four being members of the staff of the Virginian-Pilot, a Norfolk newspaper, visited the Chesterfield hotel and attended the cabaret performances.

These witnesses testify with almost complete unanimity as to what they saw and heard on the occasion of the above visit, differing only in respect of trivial details. The testimony of these witnesses is to the following effect:

They arrived at the Chesterfield hotel about half past twelve, and sent for John Pope, asking him if it would be all right to bring in a party of newspaper men. Pope replied that it would, but that there were some policemen in the place at the time. The party suggested that they could wait, but Pope told them to "come in if they wanted to; that the police would leave in a little while, and things would be livelier after 'the law' left." Later Pope denied

that he made this remark. Pope conducted the party to the cabaret. There they found tables around the wall, with a middle space for dancing about fifteen feet long, and eight or ten feet wide. White and colored people were sitting at the tables eating and drinking, the whites on one side, and the colored on the other. The visiting party remained until about two, and when they left everything was in full swing. Holloman described what he saw as follows:

Two regularly employed professionals sang and danced, also a colored man. The songs were not suggestive. Between times white persons, male and female, danced. The professionals danced the "shimmy," or muscle dance, and were more expert than other "shimmy" dancers whom he had seen on the "stage, and in other places." The colored man was described as being unusually expert in the art of shaking the various portions of the body. One of the visitors was a white girl who was under the influence of liquor, and described herself as being as drunk as ———. She wore socks, and when dancing raised her skirts to exhibit her naked legs. This girl danced with another white girl for a minute or two in a disgusting fashion. The two women stood in the middle of the floor and went through motions suggestive of sexual intercourse. When the dance was concluded the girl who was intoxicated took her seat by her escort and leaned back against him, putting her feet on another chair with her dress above her knees, exhibiting her naked legs. There were seven or eight white women present, accompanied by men, and about an equal number of colored women and men. The witness (Hollomon) states that he was at Pope's place after midnight, about two weeks prior to the time in question, and that the dancing of the professional female dancers on that occasion was of the same character as that which took place on November 23rd. On both of the occasions described by this witness, the accused was on the premises. The other witnesses confirmed all

that Hollomon stated, and added other details in their description of the performances of the evening on the part of the dancers, and of others. Describing the dancing of one of the colored women, the witness Glennan says: "She danced an indecent muscle dance, pulling up her skirt within two inches of her crotch. This dance was followed by a dance by a white man, apparently a patron of the place, who attempted a similar muscle dance. Then came a dance by a colored man, which was of the same character, only more exaggerated. The next dance was by two white women, patrons of the place, one of them being intoxicated. It was to Mr. Glennan that one of these girls made the remark about being drunk. The dance by these women is described by this witness precisely as stated by Hollomon. Glennan also confirms Hollomon's account of the performances of the expert negro male dancer. Continuing, this witness said: "I had noticed that some of the white patrons at other tables would leave the room, and return after a brief absence with some liquid which I took to be whiskey, and poured a small quantity in four or five glasses, and filled them up with ginger ale. Thereafter, the parties seemed to liven up to some extent, but I do not know that it was whiskey." Later witness saw a white man at another table get up and go out of the room, and come back in a few minutes with two pint bottles which looked like whiskey. Subsequently, the witness got up, and went out in the hall with Mr. Jenkins, and just outside of the cabaret door he saw a young negro man, and asked him if he could get them some liquor. The negro replied that he could in a few minutes for $7.00 a pint. Glennan went back to his table, and in a few minutes the negro summoned him into the hall, Jenkins accompanying him. They followed the negro into an unoccupied room immediately across the hall from the dance hall; as they went into this room the light was turned on by some one in the hall, who said: "I'll turn

the light on for you." Witness did not know who made this remark, or turned on the light. The young negro produced a pint of liquor, for which witness paid him $7.00, but the negro insisted that the witness pour the whiskey from the whiskey bottle into a ginger ale, or coca cola bottle before it was carried back to the table. This was done. Witness "did not know this negro, never saw him before, or since," and could not say that he was an employee of John Pope, but "he seemed to have the run of the place." The whiskey was taken back to the dance hall, and most of it drunk by Glennan and his associates. Witness would not say that John Pope was in the room when anything suggestive, or vulgar, was going on, but he came in several times. Witness and party were at the dance hall about two hours. During that time "no effort was made by any one to prevent the recurring indecency, and drinking described, and it all took place in full view of all present, white men and women, and colored men and women."

The witness Murray confirms Glennan's testimony. He heard Pope's statement that things would liven up as soon as "the law" left. He saw the dancing which has been described, and states that the "dancing of the negro women performers and of the negro man was indecent;" that he had seen similar dances on the stage, but the dances at John Pope's place were worse, because more exaggerated. This witness states that when the expert negro male dancer was performing, he "danced close to the table where the young woman who wore socks, was seated, and in reaching distance of her shook his breast in her direction, whereupon she responded by shaking her breast at him." Going into another part of the building, witness met John Pope, and was asked if he was having a good time. On his answer in the affirmative, Pope said: "I am glad to hear it; I try to show my white friends a good time; we got the liveliest place in the country, and I'm going to keep it live unless

my white friends get me mixed up with the law." Witness drank part of the liquor which Glennan brought back in the coca cola bottle, and it was whiskey. Witness also saw people at other tables pouring liquor from bottles into their glasses, and filling same with ginger ale. He did not know what was poured, but immediately thereafter the parties would liven up, "as if cheered by the drink." He heard one white girl at another table say: "They must have put dynamite in this stuff." To this witness the most shocking feature of the performance was that the dances described took place before negroes and white people of both sexes. When witness left, Pope was on the premises, the things seemed as lively as at any time during the night.

William Jenkins is city editor of the Virginian-Pilot, and was a member of the party on the night in question. His testimony is to the same substantial effect in all respects as that of Mr. Glennan. The last witness in chief for the Commonwealth was Herman Thomas, also a member of the staff of the Virginian-Pilot. This witness in the main saw the same things, and testified on the same lines as the other members of the party. He regarded the dancing of the paid performers "indecent." Had seen "shimmy" dancing at other places, and on the stage, and considered it immoral. Regarded the dancing at John Pope's by the negro performers as similar in character, but more exaggerated. He saw the indecent and degrading performance by the negro dancer, and the intoxicated white girl, and said that it lasted from a half minute to a minute. He also saw the "highly suggestive and indecent" dance by the two white girls, described by the other witnesses. Witness partook of the liquor brought back by Mr. Glennan, and said that it was whiskey, and had a kick in it. Saw other people pouring something from bottles into their ginger ale, and they appeared to be "livelier" thereafter. He thought the dancing of the professionals was "like what is called oriental or 'hootchy-cootchy' dancing."

The testimony for the defendant is voluminous, but in the main does not relate to the occurrences of November 23, 1921, but to conduct in the cabaret on previous occasions. A number of the witnesses for the accused are police officers and members of the vice squad of Norfolk city. One and all these officers state that they had been in Pope's cabaret numerous times, and, while there, had never observed any disorder, or indecent behavior, or any conduct justifying an arrest. Some of the officers had seen the "shimmy" dancers and did not consider their dances "immoral, indecent or suggestive, or different in character from what is commonly performed at theatres and cabarets." One or more of these witnesses state that they had been at the cabaret at different hours of the night, and by different doors, and had never been able to detect anything which would warrant an arrest, though they made every effort to discover violations of the law.

Without going into details, it may be said that the testimony of these officers gives the cabaret a clean bill of health, so far as their observation went, for the period preceding the night of November 23, 1920. Sergeant Moore states that he consulted Mr. R. B. Spindle, assistant city attorney, with reference to keeping white people out of John Pope's establishment, and was advised by him that he "knew of no law to exclude white people from the place, if their tastes were sufficiently degraded to make associations with negroes desirable." This witness also stated that he had "tried particularly to discover whether any whiskey had been sold at Pope's establishment, but had been unable to discover any evidence of sales."

Benjamin Vick and William Morrisette were at the cabaret on the night of November 23rd, but saw nothing improper in the conduct of any one while there.

The other witnesses for the defendant, several of them being colored physicians, agrée in saying that as visitors

50

at the cabaret, they had never seen anything indecent, or immoral, or different from what they had seen at the theatres, and other cabarets. Nor had any of the witnesses who testify on this point bought any liquor at the Chesterfield, or seen any sold, or drunk there. However, one or more of the witnesses for the accused state that had they seen such dancing as was described by the witnesses for the State, they would have regarded it immoral. Some of the witnesses for the accused state that they would not have visited, or taken friends to Pope's cabaret, if they had considered the place disreputable.

One of the witnesses for the accused, Priscilla Crump, stated that she thought the opening of the Chesterfield had been a benefit to that part of town; that it seemed to be a nice place. On cross-examination this witness added that she knew 800 Lincoln street (that is, the Chesterfield hotel), when it was occupied by Jennie Williams, a white woman, and run as a bawdy house, and that "she supposed her establishment was a benefit to the community." Witness added that she had never heard any of the neighbors complain of noise or disorder from Pope's place. In this connection it may be stated that the witness Jenkins testified that he did not think the "music was audible to a great distance outside of the cabaret, as the walls were thick and without windows."

The accused testified in his own behalf, denying *in toto* that he conducted a disorderly house, or was aware of any acts of indecency, impropriety, or illegality on his premises. He insisted that the dances were decent, and the women performers of good character; that he had never had any complaints of impropriety against the conduct of his cabaret; that he had never allowed liquor to be drunk there; that it was possible it was drunk there, as bootleggers were very active in Norfolk; that he had never given an invitation to a white person, other than the police, to visit his

premises, and had consulted the police authorities as to whether there was any objection in law to white people visiting his cabaret, and was advised by Sergeant Dudley, as coming from the Commonwealth's attorney, that it was not unlawful for white people to come there as long as there was no disorder, or misbehavior; that he had kept the races apart in his cabaret, but had made no effort to exclude white people; that he was about the cabaret at different times on the night of November 23rd, but saw no indication that liquor was being served, nor anything improper or indecent in the way of dancing, or conduct; that if he had seen such vulgar and suggestive dancing as was described by the newspaper men, or had been told of its occurrence, he would have put a stop to it at once; that the colored performer was a negro actor then playing in Norfolk, who had volunteered to dance that night, and he had accepted his offer (this man was not put on the stand); that he had been raided twice, arrested with other men, and charged with gambling, and acquitted; that there were no signal buttons in his house; that he was willing to refuse white people admittance in the future, if the police would support him in that action, but that heretofore he "didn't know how he could stop them from coming;" that he knew nothing of the whiskey purchased by Mr. Glennan; that he never had had cause to interfere with "any conduct occurring in his dance hall;" that one Clarence Williams was the floor manager of his dance hall, and was on duty continuously during the visit of the newspaper party; that Williams had been summoned for the Commonwealth and was then in the court room; that he (Pope) was on the premises most of the time, and in the dance hall from time to time, but most of his work was at the buffet in another part of the building.

Nowitzky, a police officer of Norfolk city, was put on the stand for the Commonwealth. He stated that he partici-

pated in two raids on the Chesterfield hotel in February, 1920, when John Pope and other colored men were arrested for gambling; that while one policeman was reading the warrant to Pope, and witness was on his way to the third floor of the hotel, he could see the lights flickering on and off on said floor, as if a signal was being made; that he found about a dozen negro men in a room on the third floor, who tried to run when he reached that floor; that he traced the electric wire from said room, and found that the lights could be controlled from the telephone booth on the first floor.

There was evidence before the jury in addition to what has been cited, but the abridgement given is sufficient for a disposition of this case. It will be noted that none of the witnesses for the accused, save John Pope, and possibly a police officer, or two, who were present in the cabaret prior to, and for a short time after the arrival of the newspaper party, testify as to the occurrences of that night. Even the testimony of these officers and of the accused himself is negative in its character. The former saw nothing amiss while on the premises. The incidents of that particular evening, as related by the witnesses for the State, are, therefore, substantially unchallenged. It needs no argument to establish the conclusion that much of the dancing described was indecent, degrading and prejudicial to the public morals. The evidence as to the purveying of ardent spirits on the premises is both direct and circumstantial, and convicts the accused of guilty knowledge of and participation in same. The stuff that was brought to the dance hall in coca cola, or ginger ale, bottles, and added to the ginger ale in the glasses of the patrons, was evidently whiskey, or some variety of ardent spirits. One or more witnesses identify it as whiskey. The comment of one young woman that "they must have put dynamite in this stuff," and the enlivening effect upon the drinkers of this addition to the harmless

ginger ale, convincingly indicates that the contents of the coca cola bottles were ardent spirits in some form. The contention of the accused is that he knew nothing of the sale of liquor on his premises, that he was opposed to such sale, and had never authorized or permitted it; that if conducted it was the work of bootleggers who had obtruded themselves upon his premises, and availed themselves of the opportunities afforded to sell contraband spirits to his patrons. The facts related by the witnesses repel and refute this contention. It was not a casual sale, a single incident of an evening, but a continuous performance. The witnesses relate that they saw white patrons of the cabaret going out from time to time, and returning with enlivening fluid in coca cola bottles. Thereupon Mr. Glennan went out and found a young negro just at the door of the dance hall. He arranged with him to procure whiskey at $7.00 a pint. In a few minutes the negro summoned witness to the hall. As they went across the hall into an unoccupied room, some one obligingly turned on the light. The whiskey was thereupon secured, and poured into a coca cola bottle, as required, in order to avert suspicion as to its contents upon return to the dance hall. The witness did not know this negro, but stated that he seemed to have "the run of the place." According to defendant this negro and his ally who turned on the light, were organized bootleggers, plying their nefarious traffic upon his premises, using his rooms and lights, and serving his patrons with whiskey at $7.00 a pint, without his consent, and contrary to his wishes. It would be passing strange, indeed it would tax human credulity to believe that such was the case. It is conceivable that an employee, or employees, of a hotel proprietor himself firmly opposed to this illicit traffic and using his best efforts to suppress the same, might make a sale, or sales, of ardent spirits on the premises of such a proprietor without his knowledge. Even an interloper at

times might effect such sales. Under these circumstances the owner would be guiltless of any offense. But the case supposed is not the case in judgment. The whiskey supplied was as readily secured and as systematically provided as ginger ale, or coca cola. The operator was at the door of the cabaret, within Pope's establishment. He used one of Pope's rooms in which to transfer the whiskey into the coca cola bottles, and had an ally in the building to turn on the lights. He was apparently on duty during the entire period of stay of the witnesses for the State, which was one and a half hours at least. It would not be reasonably likely that undesired bootleggers, mischievous interlopers, could thus enter without detection upon the premises of a man who was regularly coming and going from his cabaret to his buffet, and without his knowledge, or that of his employees, ply a profitable and illicit traffic in his establishment under the circumstances related. This presumed bootlegger was in evidence whenever whiskey was desired, for it is a just inference that other patrons procured their spirits just as Glennan did, but he was apparently invisible to the accused, or to any of his attendants. It is evident that the whole arrangement was a craftily designed, but transparent scheme to evade the law, and that the sale of ardent spirits was merely one of the illegal practices pursued in the establishment of the accused.

It is a noteworthy circumstance and one to the prejudice of the defendant that he introduced no witnesses to repel in direct fashion the specific statements of the witnesses for the Commonwealth. If these damaging statements were not true, then their falsity could have been established by other witnesses present on that occasion. Such witnesses were available. There were over thirty visitors, white and black, male and female, in the cabaret after Glennan and his associates arrived. In addition, there was present in the court room at the time of the trial, the floor

manager of the accused, one Clarence Williams, who was "on duty continuously during the visit of the party composed of Glennan and others, on November 23, 1920." If the evidence of the members of this party was true in detail, then Clarence Williams saw the vulgar, immoral and indecent things described by these witnesses, and either did not consider them indecent and immoral, or knowing them to be such, did not restrain them, or report their occurrence to the proprietor. In either view, an inference injurious to the character of the establishment may be drawn.

Under the third assignment of error, the petition says: "* * the real point at issue has only a two-fold aspect:

"I. Whether under the evidence the accused has been shown to have had any knowledge of any unlawful or disorderly acts; and

"II. Whether evidence regarding a single occasion of disorderly acts in the conduct of a lawful business is sufficient under the law to justify a conviction of the offense of maintaining a common nuisance."

Apparently the theory of the defense is that they have established by the witnesses for the accused that prior to November 23, 1920, Pope had conducted a decent, orderly and unobjectionable dance hall, and that the conduct of the individuals on the night in question, as described by Glennan and his companions, even if taken to be true, was fortuitous and unexpected, contrary to the tenor of the cabaret entertainments, and unknown to and undesired by the proprietor. It will be conceded that if such was the case, the defendant should be discharged. A single act of vulgarity, or indecency, by paid performers, interpolated contrary to the instructions or wishes of the owner of a house, or the unexpected indecencies of patrons on a single occasion, or in the course of a single evening, would not constitute an establishment a common nuisance. But if the

performances at Pope's place were habitually and uniformiy decent, if they were attended normally by decent people seeking lawful recreation in the form of wholesome and pleasurable entertainment, and the sights witnessed by Glennan and others were abnormal, unusual and fortuitous, the question may well be asked, how did it happen that the evening in question furnished so many varieties of indecency, shocking in themselves, but which apparently did not shock the observers, male or female, or call for warning or rebuke from the floor manager of the accused, who was on duty all of the time? If the performances of that evening, however, were typical and characteristic of the entertainment afforded by the accused, then undoubtedly the house was a "common, ill governed and disorderly house," a plague spot in the community, and a menace to decency and good morals. At best, the "shimmy," where-- ever rendered, is not a refined or elevating dance. Slightly exaggerated, it easily becomes a suggestive and indecent performance.

The testimony of various witnesses for the Commonwealth is that on the evening in question, the shimmy dancing of these paid performers was "indecent." Hollomon states that these dancers were more expert than like dancers he had seen elsewhere, and that the dancing on the evening of the 23rd was of the same character as the dancing he had seen in the same cabaret on a prior occasion. Other witnesses describe as indecent the dancing which Hollomon calls "more expert" than that of like performers elsewhere, and which is described by another witness as being "more exaggerated." Having in mind that this specific dancing of the evening of the 23rd was pronounced "indecent" by several witnesses, the jury doubtless interpreted the terms "exaggerated" and "expert," as used by Glennan and Hollomon, to be equivalent to indecent, and concluded that the performances of "like char-

acter" on a previous occasion were also indecent. They were justified in concluding from the testimony of Hollomon and others, and by derivation from the internal evidence afforded by the character of the entertainment observed by the witnesses for the State during the hours between midnight and two in the morning, as well as from the conduct and behavior of the patrons attending this entertainment, that the incidents described were normal, not abnormal,—usual, not unusual—and typical of a continuing style of entertainment furnished by the defendant, that is to say the evidence supported the boast of the accused that his cabaret was the "livest place" in the country on the night in question, and the further conclusion that it had been "lively" theretofore.

[3, 5] As a general proposition, the fact that certain things are injurious to public morals is sufficient to render them public nuisances. At common law a disorderly house is a public nuisance, and a disorderly house has been defined as follows: "A disorderly house is a house in which people abide, or to which they resort, to the disturbance of the neighborhood, or for purposes injurious to public morals, health, convenience, or safety." 14 Cyc. p. 492.

[6] The State must prove a defendant's knowledge of improper practices in his establishment, but such knowledge may be established like any other fact by direct or circumstantial evidence. It has been held in some cases that a proprietor is presumed to have knowledge of that which goes on in his house, if it is a continuing practice. See *De Forest* v. *United States*, 11 App. Cas. (D. C.) 458.

In *Jones* v. *State*, 10 Okl. Cr. 79, 82, 133 Pac. 1134, an instruction was sustained by the appellate court, in which the jury was told that it was not necessary for the State to prove actual knowledge on the part of the accused of the character of his place, or of the inmates, or of those who resorted there, but such facts and circumstances may be shown as

will convince a jury beyond a reasonable doubt that the accused was bound to have cognizance, or knowledge, of the inmates of the house, or of those who resorted there for the purposes set out in the information.  The principle embodied in this instruction applies to proof of cognizance by the proprietor of indecent and immoral practices in his establishment, when they are recurrent.  A proprietor should be diligent to see that his entertainments are not destructive of morality, or infected with indecency.  He is not permitted to shut his eyes to occurrences that it is his duty to prevent, and find safety in a claim of ignorance.

[8] Counsel for petitioner insists that if a house is not one prohibited by law, the State must show that disorderly conduct in the house was of common and habitual occurrence, with the proprietor's knowledge, before it can convict him.  It is true, as heretofore stated, that there must be something more than a single act of improper conduct to support conviction.  There must be recurrence, but there is no particular extent of time prescribed during which the improper practices must continue, or recur, or any fixed amount of recurrence of dissolute practices to constitute an establishment a disorderly house.

In *Commonwealth* v. *Gallagher*, 83 Mass. (1 Allen) 593, the court said:  "The evidence was sufficient to warrant the jury in convicting the defendants.  A disturbance of the public peace by the assembly of noisy and dissolute persons, the illegal sale of intoxicating liquors, and other similar acts which tend to make disorder and injure public morals, and thus to create a common nuisance in a house or tenement, may be proved to have occurred in the course *of a few hours* (italics supplied), as well as during a number of days, a week, or a month.  It is the nature of the acts done, not the length of time during which they are committed that constitutes the offense."

Petitioner seeks to avert the application of this prece-

dent to the case in judgment, by pointing out that in the case cited the defendant was selling liquor, a thing prohibited by law, and maintaining his establishment for that and no other purpose. Hence, his establishment was unlawful *per se.* But as has been pointed out, while Pope had a license to conduct a lawful establishment, the evidence in the instant case shows that he was selling liquor to his patrons, a prohibited enterprise. The court in its opinion, *supra,* refers to the illegal sale of intoxicating liquors as one means by which the peace may be disturbed, but it adds, "and other similar acts which tend to make disorder and injure public morals."

"If a man keeps a house open to the public and there sells intoxicating liquor generally to persons who come together, and they when stimulated thereby, or otherwise, make disturbance, or commit acts of immorality, or in any matter violate public decency and decorum, the place is a disorderly house." 1 Bish. Cr. Law, (7th ed.), sec. 1113.

[9] In the case of *Tenement House Department* v. *Mc-Devitt,* 215 N. Y. 160, 165, 109 N. E. 88, 89, Ann. Cas. 1917a, 455, it is said: "It is true, of course, that a building may be so used on a single day as to justify the inference, with but slight additional evidence, that the illicit use has been continuous. But the inference in such case is one of fact and not of law, and must be drawn, if at all, by the trial judge in the light of the circumstances."

Petitioner discredits this authority on the ground that it is dictum, not doctrine. Conceding this to be true, the principle announced is essentially sound, and, if not law, should be made law.

It has been said that a conviction will be sustained on an indictment for keeping a disorderly house, upon proof of the drawing together of vicious, dissolute, or disorderly persons engaged in unlawful or immoral practices, thereby endangering the public peace, and promoting immorality. *Thacker* v. *State,* 48 Ark. 60, 2 S. W. 343.

[10] On the night in question, there were present in Pope's cabaret whites and blacks, male and female, some of them certainly vicious and dissolute, and engaged in immoral practices. Drinking was prevalent and one woman at least was drunk. The evidence indicates that the happenings of that evening were not casual, fortuitous or unexpected. The methodical way in which liquor was sold shows that it was a customary practice, craftily designed, not the work of an intruding bootlegger defying at once the law and the defendant on his own premises. The illegal performances were continuous until long after midnight. The pace was "fast and furious." The dancing described as "indecent" was of the same character as that occurring on a previous evening. Hence, "additional evidence, even if slight" was not lacking, and the jury was justified in drawing the inference of fact, which evidently they did draw, that the occurrences of the night in question were measurably a recurrence of like antecedent illegalities.

[11, 12] The plaintiff in error complains that the following instructions were given at the instance of the Commonwealth:

### Instruction No. Four.

"Positive proof of actual knowledge by the defendant of the acts and doings of the women he employed is not necessary, since the law requires him to use reasonable diligence to ascertain the character of such acts and doings, and all that the State need do is to prove facts which would put a reasonable man on notice; but knowledge on the part of the defendant, either actual or constructive, is an essential element of the offense, and must be proved by the Commonwealth beyond a reasonable doubt, either by direct, or circumstantial evidence."

*Instruction No. Nine.*

"The court instructs the jury that before the acts complained of may be regarded by the jury as constituting a public nuisance, they must be of common and habitual occurrence, but the law fixes no definite continuance of time during which such acts must occur to meet the requirements of 'common and habitual occurrence.' It is sufficient to meet this requirement if they occur with such frequency, and during such substantial period of time covered by the indictment, as to constitute a continuing menace to public morals."

It is not perceived that the instructions complained of announce incorrect principles of law, or were to the prejudice of accused. The defendant in the instant case may complain that the evidence of the State does not justify conviction under the conditions imposed by these instructions, but the principles stated are sound enough. One of the authorities cited by petitioner, to-wit, 18 Cyc., p. 1246, says: "A person to be criminally responsible for the keeping of a disorderly house must have knowledge of the disorderly conduct in, or about, the house, or of improper use to which the house is put. However, actual knowledge of the keeper is not necessary; implied or constructive knowledge is sufficient. Such knowledge need not extend to particular acts, or facts." And on p. 1272, *Idem:* "Defendant's knowledge of the character of the house may be sufficiently shown, either by direct, or circumstantial evidence."

Another court has said, and we agree with its pronouncement, that a defendant "cannot shut his eyes to what is going on around him, for the purpose of avoiding knowledge, and then defend on the ground of lack of knowledge."

It is perfectly true, as stated in instruction nine in effect, that there must be continuance by repetition of improper

acts to constitute a disorderly house, or to state the same proposition in different language: "There must be some measure, though brief, of continuity and permanence." But this measure of continuity and permanence of operation is a question of fact to be proved as any other fact. Another authority says: "The acts of misconduct should be at least often enough to indicate a manner of keeping."

Instruction nine advises the jury that the "acts complained of, before they can be regarded as a public nuisance, must be of common and habitual occurrence." But these words, "common and habitual occurrence," have a flexible meaning, and are not to be so construed as to impose too weighty a burden upon society when seeking to deal with evils of this character. The hands of organized authority must not be tied by too great refinement of construction. A killing must be a willful, deliberate and premeditated killing, to be murder in the first degree; it must be a predetermined killing upon consideration, but this has not been construed to mean that the design to kill should have existed for a considerable duration of time. It is familiar law that such design may be formed at the moment of the commission of the act. So in cases of the character of the instant case, the continuance by repetition of indecency and immorality in the house of an owner, with his assent and connivance, necessary to make the house a disorderly house, has no fixed duration or definite time limit prescribed, provided the acts of misconduct are often enough to indicate a manner of keeping. Each case must be adjudged according to its own circumstances. Instruction number nine correctly defines for the jury the words "common and habitual occurrence," and left them to determine from the evidence whether the acts complained of were of "common and habitual occurrence," as so defined.

We find no error in these instructions.

·Plaintiff in error complains further that the court amended instructions 5, 6 and 7, offered by him, and gave them in amended form. The amendment of 5 and 6 consisted in the addition of the words: "And such knowledge must be actual, or constructive, as defined by instruction number four." This amendment was certainly proper.

[13] The court amended instruction number seven for the defendant by striking out the concluding paragraph of same and adding the following words to the preceding paragraph: "but such improper conduct must cover a substantial period of time." The matter stricken out referred to the necessity for a recurrence of unlawful conduct to make an establishment a disorderly house. On this point the jury had been adequately instructed by instruction number nine for the plaintiff. Hence, the elision of the concluding paragraph did not operate to the prejudice of defendant. Nor was it to the latter's prejudice that the jury was told in the matter added by the court that the "improper conduct" essential to justify conviction "must cover a substantial period of time."

[14] Instruction ten offered by the defendant was rejected by the court. This instruction advised the jury that if they believed from the evidence that the police and various respectable citizens had visited Pope's establishment prior to November 23, 1920, and had not seen any improper, immoral, or indecent, conduct during that period, then if the jury believe that there was improper conduct on the part of persons on the night in question, this was insufficient for conviction; that in order to justify conviction, the improper conduct must be customary, common, or habitual. There was no occasion to give this instruction. The jury had already been instructed with respect to the necessity for common and habitual occurrence, to support conviction, and advised as to the meaning of the words "common and

habitual occurrence." It was for the jury to determine the value to be attached to the evidence of the police, and of the various respectable citizens who had visited the cabaret of the accused prior to November 23, 1920. If instruction ten was intended to advise the jury that the fact that officers and citizens, on repeated visits to defendant's establishment, prior to November 23rd, had not observed anything improper, indecent, or illegal, was in itself conclusive evidence that improper, immoral and illegal acts had not taken place during that period, then the instruction was manifestly improper. The lack of value of such negative evidence is illustrated in the instant case. At least two police officers were in Pope's establishment on the night of the 23rd, and while there saw "nothing out of the way in the conduct of anybody," or "anything like what they (*i. e.,* the witnesses for the State) testified to." Nevertheless, it is conclusively shown that on this very night disgusting and revolting acts to the prejudice of good morals took place, and that ardent spirits were easily procured by the visitors at the door of the dance hall, and within the establishment of the accused.

This case was submitted to a jury under sufficient instructions. They have passed upon the conflict of testimony, such as it is, and reached a conclusion adverse to the accused. There is no reason to interfere with that verdict. .

The petition of the plaintiff in error states, referring to the verdict, that the "only natural and reasonable inference is that John Pope was convicted, not on the law and the evidence, but in consequence of popular hysteria induced by one of those moral upheavals which periodically occur in nearly every city. The accused in this case is a vicarious sacrifice to the gods of respectability and reform." This contention, repeated in different terms in other portions of the petition, has caused us to reproduce the evidence in

considerable measure, and to discuss it, as well as the questions of law, at no little length, in the effort to ascertain whether in this case there was a miscarriage of justice, as insisted by petitioner. We are satisfied that the jury was sufficiently and correctly instructed as to the law, and that they were justified in their conclusion that the defendant was guilty as charged. The case will be affirmed.

*Affirmed.*